## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| HONEYWELL INTERNATIONAL, INC., et al., | : <br> : <br> : |
| Plaintiffs, | : <br> : |
| v. | :    C. A. No. 03-242-MPT |
| UNIVERSAL AVIONICS SYSTEMS CORP., et al., | : <br> : <br> : <br> : |
| Defendants. | : |

## MEMORANDUM OPINION

Thomas C. Grimm, Esquire and Kristen Healey, Esquire, Morris, Nichols, Arsht & Tunnell, 1201 N. Market Street, P.O. Box 1347, Wilmington, Delaware 19899.
    Of Counsel: Steven D. McCormick, Esquire, Kirkland & Ellis LLP, Chicago, Illinois;
    and Sarah Slover, Esquire, Mayer, Brown, Rowe & Maw LLP, New York, New York;
Attorneys for Honeywell International, Inc. and Honeywell Intellectual Properties, Inc.

William J. Marsden, Jr., Esquire and Thomas L. Halkowski, Esquire, Fish & Richardson, P.C., 919 N. Market Street, Suite 1100, P.O. Box 1114, Wilmington, Delaware 19899.
    Of Counsel: Howard G. Pollack, Esquire and Michael R. Headley, Esquire, Fish &
    Richardson, P.C., Redwood City, California;
Attorneys for Sandel Avionics, Inc.

Wilmington, Delaware
Dated: November 17, 2005

Thynge, U.S. Magistrate Judge

## I. Nature and Stage of the Proceedings

This action, which originated as a patent infringement case, involves technology in the aviation industry. On March 3, 2003, Honeywell International, Inc.[1] and Honeywell Intellectual Properties, Inc.[2] (collectively "Honeywell") filed suit against Sandel Avionics, Inc. ("Sandel")[3] alleging infringement of claims 1, 2, 4, and 5 of U.S. Patent No. 4,914,436 (the "'436 patent").[4] On March 24, 2003, Sandel filed its answer denying Honeywell's allegations and its counterclaims alleging the '436 patent was invalid, unenforceable, and not infringed. On April 14, 2003, Honeywell filed its answer to Sandel's counterclaims.

The court conducted claim construction and summary judgment proceedings simultaneously. On November 18, 2004, the court set forth its claim construction ruling and denied Sandel's motion for summary judgment of non-infringement.[5] During the pre-trial conference, Honeywell withdrew its assertion that Sandel infringed claims 2, 4, and 5 of the '436 patent, and Sandel withdrew its invalidity case, leaving Sandel's alleged infringement of claim 1 of the '436 patent as the sole issue for trial. On November 30, 2004, Sandel moved to preclude Honeywell from offering any testimony regarding infringement under the doctrine of equivalents. The court granted Sandel's motion on December 1, 2004.[6] A jury trial commenced on December 1, 2004. On

---

[1] Honeywell International, Inc. is a Delaware corporation with its principal place of business in New Jersey.
[2] Honeywell Intellectual Properties, Inc. is an Arizona corporation with its principal place of business in Arizona.
[3] Sandel is a Delaware corporation with its principal place of business in California.
[4] Universal Avionics Systems Corp. ("Universal") was also a named defendant in the complaint. Honeywell's action against Universal is not addressed in this opinion.
[5] *Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.*, 347 F. Supp. 2d 81 (D. Del. 2004).
[6] *Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.*, 347 F. Supp. 2d 114 (D. Del. 2004).

December 8, 2004, the jury returned a verdict that Sandel does not infringe claim 1 of the '436 patent.

On January 8, 2005, Sandel filed a post-trial brief regarding equitable defenses and moved for declaration of exceptional case. This opinion addresses Sandel's equitable defenses of unclean hands and estoppel and Sandel's motion for declaration of exceptional case. For the reasons set forth below, the court holds that the '436 patent is not unenforceable due to unclean hands nor inequitable conduct. Sandel's motion for declaration of exceptional case is denied.

## II. Background[7]

Honeywell and Sandel are competitors in the market for terrain awareness and warning systems ("TAWS"). Honeywell manufactures and sells the "Enhanced Ground Proximity Warning System" or "EGPWS." THE EGPWS employs technology from the '436 patent as well as other Honeywell patents. Sandel manufactures and sells the "ST3400 TAWS/RMI."

The EGPWS and the ST3400 TAWS/RMI are designed to solve a problem in the aviation industry known as controlled flight into terrain ("CFIT"). CFIT refers to a category of accidents that occur when an aircraft is flown into the ground during controlled flight. CFIT crashes generally occur as a result of pilot error as opposed to system malfunction or failure.

A precursor to the technology employed in the EGPWS and the ST3400 TAWS/RMI is the Ground Proximity Warning System ("GPWS"). The GPWS monitors

---

[7] All facts are taken from the '436 patent, as well as, relevant trial testimony, declarations, and other exhibits submitted with the parties' briefs.

the flight conditions of an aircraft using downward-looking technology and provides a warning if flight conditions are such that inadvertent contact with the ground is imminent. Because the GPWS is limited to the downward-looking technology, it has certain disadvantages and cannot prevent all CFIT accidents.

In the late 1990s, the Federal Aviation Administration ("FAA") issued for public comment a draft of a technical standard order ("TSO") relating to *forward-looking* TAWS technology. The TSO establishes the minimum performance standards required of a TAWS device to obtain FAA approval for installation into certain aircraft. The FAA also issued a draft rule that required certain aircraft to have a TSO-compliant TAWS installed no later than March 29, 2005. TSO-C151, entitled "Terrain Awareness and Warning Systems," issued on August 16, 1999, was later amended, due to some technical revisions, as "TSO-C151a" on November 29, 1999.[8]

At the request of the FAA, Honeywell actively participated in the creation of the TAWS TSO. Don Bateman, one of the named inventors of the '436 patent, provided the FAA with a first draft of the TAWS TSO. The FAA asked Honeywell to participate in the TAWS TSO drafting process in part because Honeywell had developed a commercially successful forward-looking TAWS system, the EGPWS, long before the TAWS TSO was enacted. Prior to the creation of the TAWS TSO, Honeywell had already created and installed numerous EGPWS devices in commercial aircraft with FAA approval. Subsequent to the enactment of the TAWS TSO, Sandel began to develop a TAWS-compliant device, the ST3400 TAWS/RMI.

---

[8] TSO-C151a and the FAA TSO enumerating the specific requirements for compliance with TSO-C151a will be referred hereinafter as "the TAWS TSO."

In May 2001, Honeywell hosted its sixth annual industry CFIT conference. On an invitation from Mr. Bateman, Sandel gave a detailed presentation regarding its TAWS device. Mr. Bateman and Honeywell Air Transport President Frank Daly attended the presentation. At no time after Sandel's presentation or during the conference did anyone from Honeywell mention its patents or patent applications or claim that the ST3400 TAWS/RMI infringed. The ST3400 TAWS/RMI was certified by the FAA in April, 2002.

On May 10, 2002, Honeywell sued Sandel and Universal for patent infringement of five U.S. patents.[9] The '080 complaint made no reference to the '436 patent.[10] The '080 complaint alleged that the ST3400 TAWS/RMI infringed five Honeywell patents directed to its EGPWS technology. Sandel served its invalidity contentions in the '080 suit on January 14, 2003.

In February 2003, Honeywell attempted to amend the '080 complaint to add the '436 patent as a sixth-patent-in-suit. Sandel and Universal objected to such amendment or consolidation. On March 3, 2003, Honeywell filed suit against Sandel specifically alleging the Premature Descent Alert ("PDA") and Virtual Approach Path ("VAP") functions of the ST3400 TAWS/RMI infringed the '436 patent.

### III. Unclean Hands

#### A. Legal Standard

To prove the defense of unclean hands, Sandel must show that Honeywell "conducted [itself] as to shock the moral sensibilities of the judge," *Gaudiosi*

---

[9] *Honeywell Int'l, Inc. v. Universal Avionics Sys., Inc.*, 343 F. Supp. 2d 272 (D. Del. 2004) (hereinafter "*Honeywell '080*" or "*'080*").
[10] The '436 patent issued April 3, 1990.

4

*v. Mellon*, 269 F.2d 873, 882 (3d Cir. 1959), or stated otherwise, that Honeywell's conduct was "offensive to the dictates of natural justice." *Aptix Corp. v. Quickturn Design Sys., Inc.*, 269 F.3d 1369, 1375 (Fed. Cir. 2001). "One who comes into equity must come with clean hands and keep those hands clean throughout the pendency of the litigation even to the time of ultimate disposition by an appellate court." *Gaudiosi*, 269 F.2d at 881; see also *Aptix Corp.*, 269 F.3d at 1376 ("'[Courts of equity] apply the maxim requiring clean hands only where some unconscionable act of one coming for relief has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation.'" (quoting *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245 (1933))).

A fundamental principal upon which equity jurisprudence is found is that before a complainant has standing in court, he must not only show a good and meritorious cause of action, but also must come into court with clean hands. Therefore, the complainant must be honest with the court. Everything that enables a full and fair determination of the matters in controversy should be placed before the court. See *Keystone*, 290 U.S. at 244. The governing principle is that if a party, who sets the judicial machinery in motion to obtain a remedy, violates conscience, good faith, or any other equitable principle "'then the doors of the court will be shut'" and the court will refuse to acknowledge his right to any remedy. *Aptix Corp.*, 269 F.3d at 1375 (quoting *Keystone*, 290 U.S. at 244-45). The clean hands maxim gives broad discretion to the court's equity power in refusing to aid an unclean hands litigant. See *Gaudiosi*, 269 F.2d at 881. It is not related to the liabilities or claims of the parties, nor fettered by the absence of actual damages. The court is not bound by any formula, restraint, or

limitation which restricts the free and just exercise of its equitable discretion. *Id.* at 882. Any willful act, which can rightfully be said to transgress equitable standards, is sufficient. *See Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 815 (1945). If the wrongdoing occurs during the prosecution of the patent, in the furtherance of obtaining a patent right, then it can render the patent unenforceable. Alternatively, if unclean hands occurs during litigation, it bars any recovery by the offending party. *Aptix Corp.*, 269 F.3d at 1376. The unclean hands doctrine provides a defense to an otherwise valid legal claim when a plaintiff has engaged in "unconscionable" conduct that "has immediate and necessary relation to the equity that [the claimant] seeks in respect of the matter in litigation." *Keystone*, 290 U.S. at 245.

### B. Position of the Parties

#### 1. Sandel's Contentions

Sandel contends that Honeywell's actions constitute misconduct, which preclude Honeywell from profiting from its own "unclean hands." Sandel's unclean hands defense is based on two separate arguments. First, Sandel argues that Honeywell brought the '080 suit and then this follow-on suit to create and prolong market uncertainty for Sandel. Second, Sandel argues that Honeywell failed to undertake any reasonable effort to determine if Sandel actually infringed the '436 patent before filing suit.

Sandel argues that Honeywell delayed and then filed the '080 suit at a time calculated to cause the most harm to Sandel. At the sixth annual industry CFIT conference in May 2001, on an invitation from Honeywell, Sandel gave detailed presentations regarding its TAWS products. At no time during the conference did

Honeywell mention its patents or patent applications or claim that the ST3400 TAWS/RMI infringed. Instead, Sandel argues that Honeywell waited for another year to take action while Sandel spent millions of dollars developing its TAWS to meet FAA certification requirements.

Honeywell brought the *'080* suit against Sandel on May 10, 2002, a few weeks after Sandel first publicly announced that it obtained certification for its ST3400 TAWS/RMI.[11] Sandel argues the *'080* suit was clearly timed to have maximum impact on the market introduction of the ST3400 TAWS/RMI. Sandel maintains that "Honeywell was also aware when it brought the [*'080*] suit that the time-line for compliance with the FAA mandate for installation of TAWS devices was limited and that the deadline for retrofitting existing aircraft with TAWS devices - Sandel's primary target market - would expire in March of 2005."

In addition, Sandel argues that Honeywell only brought suit on the '436 patent when faced with prior art in the *'080* suit. Sandel served its invalidity disclosures in the *'080* suit on January 14, 2003, raising prior art publications and pre-critical date public and commercial activities. In February 2003, Honeywell attempted to amend the *'080* complaint to add the '436 patent as a sixth patent-in-suit – a litigation tactic that Sandel claims was to maintain market uncertainty.

Furthermore, Sandel argues that Honeywell failed to properly investigate the merits of the claims it raised with regard to the '436 patent. Sandel contends that Honeywell "did not have the relevant Sandel source code, did not obtain a [ST3400

---

[11] The press release announcing FAA certification of the ST3400 TAWS/RMI bears a date of April, 2002.

7

TAWS/RMI], did not reverse engineer a [ST3400 TAWS/RMI], and did not even ask Sandel how its PDA and VAP functionality worked before filing suit on the '436 patent." Sandel also argues that nothing in its publicly available documents provides evidence of possible infringement of any of the asserted claims of the '436 patent, even applying Honeywell's own claim construction. The '436 patent requires the use of "heading" (bearing) for alignment. Honeywell's expert, Dr. Robert John Hansman, admitted that PDA alone cannot infringe the '436 patent, and the use of heading (bearing) for alignment is never discussed in public materials regarding the ST3400 TAWS/RMI, including its VAP functionality. Although Honeywell's attorney was in possession of Sandel's Design Requirements and Objectives ("DRO") documents through discovery in the '080 litigation, Sandel argues those documents were confidential under a protective order and cannot be used to investigate potential claims unrelated to those brought in the '080 case.

    Thus, Sandel argues that Honeywell needed confidential Sandel documents, the PDA/VAP source code and the Sandel DRO, to make a claim for infringement. Dr. Hansman relied on these confidential Sandel materials in his expert reports and testimony, but Honeywell and Mr. Daly did not have, nor did they request these materials before filing suit on the '436 patent. Thus, Sandel argues that Honeywell could not have had any basis upon which to assess whether Sandel infringed the '436 patent at the time Honeywell filed suit. Sandel further points to the complete absence of any paper trail regarding any alleged investigation as evidence that Honeywell failed to undertake any analysis before filing suit.

    Based on these two arguments, Sandel argues that equity demands that

Honeywell's misrepresentations and misconduct preclude enforcement of the '436 patent.

### 2. Honeywell's Contentions

Honeywell largely argues that Sandel's unclean hands defense is simply a repeat of the same arguments and evidence that were rejected by this court in *Honeywell '080*. In response to Sandel's argument that Honeywell brought the *'080* suit and then this suit to create and prolong Sandel's market uncertainty, Honeywell first argues that it had no obligation to speak out concerning its patents at the 2001 industry CFIT conference. Honeywell claims that it "had every right to assess which of the many companies that announced an intention to develop a TAWS system after the announcement of the FAA's planned mandate would actually do so, and, within a reasonable time, assert its patents when it chose to do so." Furthermore, Honeywell argues that Sandel fails to point to any evidence that it detrimentally relied on Honeywell's silence.

Honeywell also notes that when it decided to assert the '436 patent against Sandel's ST3400 TAWS/RMI, it did not intend for that claim to proceed as a separate lawsuit, but rather as a sixth patent in the *'080* suit. On February 5, 2003, Honeywell notified Sandel and Universal that Honeywell intended to amend its *'080* complaint to add the '436 patent. Sandel and Universal objected to amendment or consolidation causing Honeywell's '436 claim to proceed as a separate lawsuit for an additional year. Honeywell contends that "for Sandel to now argue that the additional year of litigation 'and counting' was a Honeywell anticompetitive tactic is to ignore the fact that it was Sandel's and Universal's preferred way to litigate this case, not Honeywell's."

In response to Sandel's argument that Honeywell had no basis for asserting the '436 patent, Honeywell contends that by February 2003, when Honeywell attempted to add the '436 patent as a sixth patent-in-suit, there was substantial public information about Sandel's ST3400 TAWS/RMI to justify Honeywell's decision to assert the '436 patent. Honeywell argues that it received such information from Sandel literature in addition to feedback from Honeywell's customers, sales representatives, and field engineers.

Honeywell further argues the public information about the ST3400 TAWS/RMI included information about the features that Honeywell claimed infringed the '436 patent, the PDA and VAP functions. For instance, Honeywell notes that Sandel CEO Gerry Block's presentation at the 2001 industry CFIT conference included a description of Sandel's VAP functionality. Honeywell further points to Mr. Block's testimony at trial that in 2002 Sandel published sales literature describing and illustrating its TAWS. That literature describes Sandel's distance-based PDA protection envelope and contains, in Mr. Block's words, "a diagram showing what a VAP is." Honeywell notes that the June 2002 version of Sandel's Pilot Guide describes Sandel's PDA, based on "proximity to the nearest airport," and also describes and diagrams Sandel's VAP, including the lateral dimensions showing its alignment with the runway.

Furthermore, Honeywell argues that after Sandel began marketing its ST3400 TAWS/RMI in 2002, Honeywell received feedback from field engineers, marketing representatives, and customers concerning the ST3400 TAWS/RMI. Honeywell claims this information was referred to Honeywell's inside and outside counsel for evaluation, who eventually advised Mr. Daly that Honeywell should assert the '436 patent against

Sandel's ST3400 TAWS/RMI. Honeywell argues its pre-suit inquiry concerning the '436 patent is evidenced in Mr. Daly's testimony concerning information from the marketplace, including competitor presentations and oral discussions with Honeywell counsel about the topic.

### C. Analysis

The court does not find that Honeywell engaged in unconscionable conduct during the 2001 industry CFIT conference nor regarding the timing and purpose of the '080 suit and this follow-on suit.

Sandel claims that after Mr. Block presented details of its TAWS products at the 2001 industry CFIT conference, Honeywell neglected to inform Sandel of its patents or that Sandel might infringe. Sandel, however, knew or should have known of the '436 patent as of the 2001 conference. By May 2001, the '436 patent and all five patents in the '080 suit had issued. Sandel further claims that Honeywell waited to sue while Sandel spent millions of dollar developing its TAWS products to meet FAA certification. However, Sandel fails to provide any evidence that it detrimentally relied upon Honeywell's one year of silence after the May 2001 conference.

Sandel also argues that Honeywell initiated suit on the '436 patent because "when it was shown its initial suit lacked merit, Honeywell needed something, anything, to drag the case out - regardless of the merits." Sandel fails to mention in its brief that Honeywell initially attempted to amend the '080 complaint to add the '436 patent as a sixth patent-in-suit, and the reason why the '436 patent proceeded as a separate case was because Universal and Sandel objected to such amendment or consolidation. Therefore, Honeywell's actions regarding the '436 patent can surely not be construed

as an attempt to prolong litigation and Sandel's uncertainty in the TAWS market.

Sandel further contends that Honeywell did not perform a reasonable, good faith investigation prior to initiating this infringement litigation. The court's analysis of that claim must begin with the long-established principle that "a patentee's infringement suit is presumptively in good faith and that this presumption can be rebutted only by clear and convincing evidence." *Handgards, Inc. v. Ethicon, Inc.*, 601 F.2d 986, 996 (9th Cir. 1979).

Generally, a patentee must conduct a reasonable investigation into potential infringement. *See Judin v. United States*, 110 F.3d 780, 784-85 (Fed. Cir. 1997) (finding that neither patentee nor counsel made a reasonable effort to ascertain infringement prior to initiating suit). Although a patentee is generally required to conduct a reasonable investigation prior to initiating an infringement suit in good faith, that does not necessarily require the patentee to reverse engineer a competitor's product to determine if it infringes.

In this case, Sandel fails to prove by clear and convincing evidence that Honeywell did not conduct a reasonable pre-suit investigation. *Handgards*, 601 F.2d at 996. Before Honeywell raised the '436 patent in February 2003, substantial public information was available about Sandel's ST3400 TAWS/RMI, including information about its PDA and VAP functionality. Sandel disclosed its VAP functionality at the 2001 industry CFIT conference. In addition, Sandel published sales literature, including its June 2002 Pilot's Guide, describing and illustrating its TAWS.

Moreover, by the time Honeywell asserted the '436 patent against Sandel, Honeywell had Sandel's PDA/VAP source code and the Sandel DRO. Sandel argues

that because the DRO was under a protective order in the '080 case, Honeywell counsel was precluded from using the DRO to evaluate potential claims unrelated to those brought in the '080 case. Sandel fails to support this proposition with any authority. The protective order did not prohibit Honeywell's designated representatives from reviewing the DRO, and Honeywell was free to assert additional patents in the '080 litigation. Sandel also argues that Honeywell could not have known about Sandel's "alignment" function. However, both the public documents and the '080 litigation documents disclose the alignment function.

Furthermore, Mr. Daly testified that, after Sandel began marketing its TAWS in 2002, Honeywell received feedback concerning the ST3400 TAWS/RMI from field engineers, marketing representatives, and customers. This information was referred to inside and outside counsel for evaluation, who advised Mr. Daly that Honeywell should assert the '436 patent against Sandel's ST3400 TAWS/RMI.

Based on the standard under the unclean hands doctrine, the court finds that Honeywell's conduct is neither unconscionable nor misleading.

## IV. Inequitable Conduct

### A. Legal Standard

Equitable estoppel is neither limited to a particular factual situation nor subject to resolution by simple or hard and fast rules. *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1041 (Fed. Cir. 1992). In order to establish equitable estoppel, an alleged infringer must establish: (1) the patentee, through misleading words, conduct, or silence, led the alleged infringer to reasonably infer that the patentee did not intend to enforce its patent against the alleged infringer; (2) the

13

alleged infringer relied on that conduct; and (3) due to its reliance, the alleged infringer will be materially prejudiced if the patentee is allowed to proceed with its claim. *Id.* If an alleged infringer establishes these three elements by a preponderance of the evidence, the patentee's claim may be entirely barred. *Id.* at 1028.

Misleading statements or conduct may include specific statements, action, inaction, or silence where there was an obligation to speak. *Id.* at 1042. The patentee's conduct must "support[] an inference that the patentee [does] not intend to press an infringement claim against the alleged infringer." *Id.* In order to have equitable estoppel, "the alleged infringer must have knowledge of the patentee and its patent and must reasonably infer that the patentee acquiesced to the allegedly infringing activity for some time." *Winbond Elec. Corp. v. Int'l Trade Comm'n*, 262 F.3d 1363, 1374 (Fed. Cir. 2001). "To show reliance, the infringer must have had a relationship or communication with the plaintiff which lulls the infringer into a sense of security in going ahead with" his or her activity. *Aukerman*, 960 F.2d at 1043. "[Material] prejudice may be a change of economic position or loss of evidence." *Id.*

### B. Position of the Parties

#### 1. Sandel's Contentions

Sandel seeks to estop Honeywell from asserting the '436 patent on the basis that Honeywell's conduct surrounding the TAWS market misled Sandel into concluding that Honeywell would not assert its patents. Sandel claims to have relied on Honeywell's actions and inactions during and after three events: (1) the TAWS rule-making process; (2) Honeywell's publication of interface specifications allowing competing TAWS systems to interface with Honeywell cockpits; and (3) the 2001

industry CFIT conference. As a result of its reliance, Sandel states it expended substantial time and economic resources to develop, certify, and market its ST3400 TAWS/RMI.

First, Sandel argues that Honeywell knew that the FAA encouraged competition in the TAWS marketplace, yet Honeywell never expressly disclosed its patents or patent applications during the formulation of the TAWS TSO. In addition, Sandel claims Honeywell knew of public concern about the possible incorporation of proprietary technology in the TAWS TSO, yet Honeywell remained silent with respect to its intent to sue those who developed a competing TAWS device. Furthermore, Sandel claims Honeywell remained silent even after the FAA stated it was removing anything that contained patented or proprietary material from the TAWS TSO. Sandel contends that Honeywell's silence "led companies like Sandel to believe there were no patent problems with building a TSO-compliant TAWS device."

Sandel claims to have been further misled by Honeywell's publication of interface specification that would allow a competing TAWS device to be used with Honeywell's cockpit systems. Honeywell published the interface specifications in response to concerns from antitrust authorities that the merger of Allied Signal and Honeywell would allow the combined entity to use its influence in other areas of avionics to improperly control the safety technology associated with the TAWS market. Sandel states that these actions further led Sandel to believe Honeywell would accept competition in the TAWS marketplace and would not sue those who built a TAWS-compliant device.

Lastly, Sandel argues Honeywell's silence at the 2001 industry CFIT conference further led Sandel to believe it was under no threat of infringement. Sandel argues

Honeywell invited Sandel to present technical information about its TAWS products at the conference, and expressly encouraged Sandel's continued development while remaining silent about potential patent issues.

In light of Honeywell's misleading pattern of conduct and silence, and Sandel's reliance thereon, Sandel argues Honeywell should be estopped from asserting the '436 patent.

### 2. Honeywell's Contentions

Honeywell contends that its actions form no basis for the application of equitable estoppel. With respect to the TAWS rule-making process, Honeywell asserts that compliance with the TAWS TSO does not require infringement of the '436 patent. In response to Sandel's argument concerning the published interface specifications, Honeywell asserts that "there is no evidence that a competing TAWS manufacturer who took advantage of the published interface specifications to tie its system into a Honeywell cockpit would necessarily be using, or have permission to use, the '436 technology, or any other Honeywell patented technology." Thus, Honeywell argues there is no implication that by making the interface available, Honeywell was agreeing to allow the use of its '436 patent. Lastly, with respect to the 2001 industry CFIT conference, Honeywell contends that "its silence for the period of time involved here, and under the circumstances here, does not meet the test of *Aukerman*, on which Sandel relies, or any other legal authority Sandel can cite."

### C. Analysis

The court finds that Sandel has not proven by a preponderance of the evidence that Honeywell misled Sandel to infer that Honeywell did not intend to enforce

the '436 patent against Sandel. Therefore, under *Aukerman*, Sandel's equitable estoppel defense must fail.

Honeywell never conveyed to Sandel in misleading words, conduct, or silence that it did not intend to assert its patents against Sandel's ST3400 TAWS/RMI. Sandel claims to have relied on Honeywell's silence during the TAWS rule-making, the publication of interface specifications, and the 2001 industry CFIT conference. However, none of these events could reasonably be taken to assume that Honeywell would not assert the '436 patent against Sandel.

Sandel argues that Honeywell's failure to mention its patents during the TAWS rule-making process led Sandel to believe there was no infringement problem with building a TAWS-complaint device. This is true; there was no infringement problem with building a TAWS-complaint device. The verdict confirmed that it is possible for a TAWS manufacturer to comply with the TAWS TSO and not infringe the '436 patent. Therefore, Honeywell's silence during the TAWS rule-making process did not imply that Honeywell would not sue those who infringed the '436 patent. For the same reason, Honeywell's publication of the interface specifications cannot be construed as Honeywell representing that it would not enforce its patents against alleged infringers.

Furthermore, Honeywell's silence during the 2001 industry conference does not meet the test of *Aukerman*. In *Aukerman*, the events that led to the district court's finding of estoppel on summary judgment were that the patentee wrote to the alleged infringer setting a deadline for taking a license, "followed by nine plus years of silence," during which the alleged infringer "bid low on highway contracts" on the assumption that he would not have to pay a royalty. 60 F.2d at 1043, 1027. In the present case,

17

Honeywell asserted the '436 patent less than two years after the 2001 industry CFIT conference and less than eight months after Sandel's first sale.

"Silence alone will not create an estoppel unless there was a clear duty to speak . . . or somehow the patentee's continued silence reinforce's the defendant's inference from the plaintiff's known acquiescence that the defendant will be unmolested." *Id.* at 1043. The court finds that there are not sufficient other factors to transform Honeywell's silence into a representation that it would not enforce the '436.

## V. Motion for Declaration of Exceptional Case

"The court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. In deciding whether to award attorneys' fees, the court must undertake a two-step inquiry. *See Interspiro USA, Inc. v. Figgie Intern. Inc.*, 18 F.3d 927, 933 (Fed. Cir. 1994). First, the court "must determine whether there is clear and convincing evidence that the case is 'exceptional.'" *Id.* Second, the court must determine whether "an award of attorney fees to the prevailing party is warranted." *Id.* In general, for a case to be deemed exceptional there must be some finding of willful infringement, inequitable conduct before the PTO, misconduct during the litigation, vexatious or unjustified litigation or some similar exceptional circumstances. *Epcon Gas Sys., Inc. v. Bauer Compressors, Inc.*, 279 F.3d 1022, 1034 (Fed. Cir. 2002).

In the instant action, the court concludes that Sandel has not satisfied its burden of establishing by clear and convincing evidence that Honeywell's actions make this case an exceptional one. Accordingly, the court denies Sandel's request for attorneys' fees.

## VI. Conclusion

For the reasons stated herein, the court concludes that the '436 patent is not unenforceable due to unclean hands nor inequitable conduct. Sandel's motion for declaration of exceptional case is denied. An appropriate order shall be issued accordingly.